IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARY NEALY,

     Plaintiff,

v.

SUNTRUST BANKS, INC., and
SUNTRUST BANK,

     Defendants.

CIVIL ACTION FILE NO.
1:19-cv-002885-SDG-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

This case is currently before the Court on a Motion for Summary Judgment filed by Defendants SunTrust Bank, Inc. and SunTrust Bank. [Docs. 42, 43].[1] As an initial matter, Plaintiff concedes she was not employed by SunTrust Banks, Inc., and as such that Defendant is entitled to judgment as a matter of law on all of Plaintiff's claims. See [Doc. 43-2 ¶2]; [Doc. 47-2 ¶2]. For the reasons detailed below, the undersigned **RECOMMENDS** that the Motion for Summary Judgment be **GRANTED** as to Defendant SunTrust Bank ("SunTrust") as well.

---

[1] Although docketed as separate motions for summary judgment, documents 42 and 43 are identical. As such, the Court refers to them collectively as a single "Motion for Summary Judgment" throughout.

## **PRELIMINARY EVIDENTIARY ISSUES**

The below factual background is drawn from the parties' statements of material facts to the extent such facts are undisputed. When a fact is disputed and both parties have cited to evidence in the record in support of their version of events, the Court draws on the evidence itself and has viewed all evidence and made all factual inferences in the light most favorable to Plaintiff. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); McCabe v. Sharrett, 12 F.3d 1558, 1560 (11th Cir. 1994); Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993). These principals largely resolve the evidentiary issues in this case, but a few issues bear closer scrutiny.

First, Defendants rely on Plaintiff's deposition in their Motion for Summary Judgment. See, e.g., [Doc. 43-1 at 13]. However, Plaintiff's deposition is not in the record. When a deposition is referenced and relied upon at summary judgment, "the party in custody of the original of that deposition shall cause the entire deposition to be filed with the Court." N.D. Ga. Loc. R. 56.1(C). Because Defendants' did not submit Plaintiff's deposition, the Court will only consider Defendants' Statement of Undisputed Material Facts relying on such evidence to the extent the statements are undisputed. See, e.g., [Doc. 43-2 ¶6]; [Doc. 47-2 ¶6].

Second, Plaintiff attemps to deny much of Defendants' Statement of Undisputed Material Facts without properly supporting her position. For example, Defendants state, "Shelly Miles is older than Plaintiff." [Doc. 43-2 ¶38]. Plaintiff responds, "Denied. SunTrust was never informed that Shelly Miles has an active real estate license." [Doc. 47-2 ¶38]. Whether SunTrust was informed of Ms. Miles having an active real estate license has nothing to do with whether "Shelly Miles is older than Plaintiff." When denying a statement of material fact, the responding party must: (i) "directly refute[ ]" the fact with "responses supported by specific citations to evidence"; (ii) state a valid objection to the admissibility of the fact; or (iii) demonstrate that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the Local Rules. N.D. Ga. Loc. R. 56.1(B)(2)(a)(2). Plaintiff's response does none of these, and as such the fact is deemed admitted. See id.

Unfortunately, many of Plaintiff's other responses contain this same flaw. Defendants state that none of Plaintiff's alleged comparators worked in the Consumer Lending Sales Center ("CLSC"), where Plaintiff worked. [Doc. 43-2 ¶42]. Plaintiff attempts to deny this statement, but her denial has nothing to do with whether her alleged comparators worked in the CLSC. See [Doc. 47-2 ¶42]. Instead, Plaintiff talks about whether the alleged comparators have "active real estate licenses," "access to

confidential information," and "the potential to receive a referral fee."  [Id.].  Again, Plaintiff's response fails to "directly refute[ ]" Defendants' statement regarding whether the alleged comparators worked in the CLSC, and so the fact is deemed admitted.  See N.D. Ga. Loc. R. 56.1(B)(2)(a)(2).

Likewise, Defendants' state that CLSC manager Donna Reed was concerned that CLSC teammates with access to a system called ACAPS might use information contained therein for personal gain.  [Doc. 43-2 ¶17].  Plaintiff tries to deny this statement because some emails sent by Ms. Reed "do[ ] not use the word ACAPS."  [Doc. 47-2 ¶17].  This fails to directly refute Defendants' Statement of Material Facts for at least two reasons.  First, most of the emails cited by Plaintiff pertain to a particular request by a particular CLSC teammate, not whether Ms. Reed had any concern about the potential for *other* CLSC teammates (like Plaintiff) to misuse ACAPS.  See [Docs. 47-11, 47-12, 47-13].  Second, and more importantly, Ms. Reed's emails *did* clearly express a concern about the ability of CLSC teammates "to access sensitive client information as well as systems that would house appraisals and real estate data."  [Doc. 47-13].  As will be discussed below, ACAPS is just such a "system" that allows access to "sensitive client information" and "real estate data" such as appraisals.  [Doc. 43-2 ¶5].

4

Instead of detailing every incident where fails to directly refute Defendants' Statement of Material Facts, the undersigned simply deems admitted every statement of material fact that is not properly disputed.  See N.D. Ga. Loc. R. 56.1(B)(2)(a)(2).

## FACTUAL BACKGROUND

SunTrust's CLSC has offices in Atlanta and Orlando.  [Doc. 43-2 ¶3]; [Doc. 47-2 ¶3].  Plaintiff worked in the Atlanta office, directly reporting to David Lind, the underwriter supervisor.  See [Doc. 43-2 ¶7]; [Doc. 47-2 ¶7].  Mr. Lind, in turn, reported to Sharon Clark, the manager of the Atlanta CLSC office.  [Doc. 43-2 ¶8]; [Doc. 47-2 ¶7].  And finally, Ms. Clark reported to Ms. Reed, the CLSC manager responsible for both the Atlanta and Orlando offices.  [Doc. 43-2 ¶9]; [Doc. 47-2 ¶9].

Plaintiff worked in the CLSC as a processing specialist, making her responsible for reviewing title work as part of the home equity loan process.  [Doc. 43-2 ¶¶1, 6]; [Doc. 47-2 ¶¶1, 6].  To underwrite and process consumer loans, CLSC teammates use a system referred to as ACAPS.  [Doc. 43-2 ¶4]; see also [Doc. 47-2 ¶4].  ACAPS is the underwriting system and application of record for consumer lending applications and it maintains sensitive client information on consumer loan applications as well as real estate data utilized in the underwriting process.  [Doc. 43-2 ¶5]; see also [Doc. 47-2 ¶5].

In December 2018, a CLSC teammate named Latonette Diljohn requested permission to work a second job as a realtor. [Doc. 43-2 ¶11]; [Doc. 47-2 ¶11]. Under SunTrust's outside employment policy in effect at the time, an employee was required to submit a request for any outside employment to their supervisor for approval. [Doc. 43-2 ¶12]; see also [Doc. 47-2 ¶12]. Ms. Diljohn's managers consulted with Ms. Reed about the request to work a second job as a realtor. [Doc. 43-2 ¶13]; see also [Doc. 47-2 ¶13]. Prior to receiving the information about Ms. Diljohn's request, Ms. Reed had not received and was not aware of any similar request by any other CLSC teammate. [Doc. 43-2 ¶14]; see also [Doc. 47-2 ¶14]. Nor was Ms. Reed aware of any CLSC teammate who was a licensed realtor. [Doc. 43-2 ¶15]; [Doc. 47-2 ¶15].

In assessing Ms. Diljohn's request to work a second job as a realtor, Ms. Reed expressed a concern that it would "be a conflict of interest . . . due to all the sensitive information [the employee] sees in her role." [Doc. 47-12 at 2]. Accordingly, Ms. Reed did "not want to approve" the request. [Id.]. Ms. Reed also became concerned about the potential for any CLSC teammate with access to information available through ACAPS to use that information for self-gain in furtherance of their outside real estate activities. [Doc. 43-2 ¶17]; see also [Doc. 47-2 ¶17]. Through ACAPS, CLSC teammates have access to information about individuals who were denied a home equity loan through SunTrust, and Ms. Reed believed that they could

use that information to refer those individuals to a broker who could assist in providing a loan, which could in turn result in a referral fee for the teammate.  [Doc. 43-2 ¶18]; see also [Doc. 47-2 ¶18].  Last, Ms. Reed was concerned the teammates could use the real estate data available in ACAPS in furtherance of their real estate business, such as using home appraisal information to assess the value of real estate in a particular area. [Doc. 43-2 ¶19]; see also [Doc. 47-2 ¶19].[2]

To avoid these risks, Ms. Reed decided to prohibit CLSC teammates with access to ACAPS from having an active real estate license.  [Doc. 43-2 ¶21]; see also [Doc. 47-2 ¶21].  Before taking any action, Ms. Reed consulted with her manager and a Human Relations ("HR") partner.  [Doc. 43-2 ¶22]; see also [Doc. 47-2 ¶22].  Ms. Reed spoke with the HR partner about Ms. Diljohn's request and about other teammates in the department potentially having active real estate licenses, and the HR partner agreed that it was a conflict of interest.  [Doc. 47-8 at 47–49].  At the time, Ms. Reed did not know of any CLSC teammate—other than Ms. Diljohn—who had a real estate license.  [Id. at 50].  Thus, Ms. Reed asked the managers she supervised to determine

---

[2] Plaintiff's assertion that "Ms. Reed never mentions anything about home appraisal information in her emails" is incorrect.  See [Doc. 47-2 ¶19].  In one of the emails cited by Plaintiff, Ms. Reed explicitly expressed a concern about CLSC teammates with active real estate licenses having access to "house appraisals." [Doc. 47-13].

whether any other CLSC teammates had an active real estate license and, if so, to communicate with those teammates that they would have to deactivate their license due to the conflict of interest.  [Doc. 43-2 ¶24]; <u>see also</u> [Doc. 47-2 ¶24].  In December 2018, Ms. Reed sent an email to her management team explaining the rationale behind her decision and telling the managers to give their subordinates "until the end of January 2019 to deactivate" their real estate licenses.  [Doc. 47-14].

With the January deadline approaching, Plaintiff requested a one-week extension to make her decision, and Ms. Reed approved.  [Doc. 43-2 ¶29]; <u>see also</u> [Doc. 47-2 ¶29].[3]  Plaintiff "inquired about working opportunities within other departments in which an active real estate license would not be considered a conflict of interest," but was not transferred to any other position.  [Doc. 6-2 at 1].  At the end of the extension, Plaintiff informed her direct supervisor that she would neither deactivate her real estate license nor resign from SunTrust.  [Doc. 43-2 ¶30]; [Doc. 47-2 ¶30].  Ms. Reed

---

[3] Plaintiff contends Ms. Reed was told Plaintiff wanted "more time because she was going to the EEOC." [Doc. 47-2 ¶29].  Again, Plaintiff's assertion is incorrect.  In the part of the deposition cited by Plaintiff, Ms. Reed testified she could not recall being told any particular reason why Plaintiff was asking for more time.  [Doc. 47-9 at 63].  Nothing Plaintiff cites suggests Ms. Reed was ever told Plaintiff "was going to the EEOC." <u>See</u> [Doc. 47-2 ¶29].  In any event, such a fact would be immaterial, as Plaintiff does not bring a retaliation claim, and she cannot amend her Complaint by trying to assert one now at summary judgment.  <u>See</u> [Doc. 6]; <u>see also</u> <u>Gilmour v. Gates, McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

instructed Plaintiff's managers to consult with Human Resources to prepare the necessary documentation to terminate Plaintiff because of Plaintiff's refusal to deactivate her real estate license.  [Doc. 43-2 ¶31]; [Doc. 47-2 ¶31].

As will be discussed in detail below, SunTrust's policy in effect at the time authorized individual managers to exercise their judgment in deciding if a teammate's outside employment activities constituted a conflict of interest.  [Doc. 43-2 ¶33]; see also [Doc. 47-2 ¶33].  Ms. Reed's rule prohibiting CLSC teammates from having an active real estate license was applied uniformly throughout the CLSC to individuals with access to ACAPS.  [Doc. 43-2 ¶34]; see also [Doc. 47-2 ¶34].  The only person working in the CLSC who was allowed to have an active real estate license was an administrative assistant, Sophia Jacobs.  [Doc. 43-2 ¶35]; see also [Doc. 47-2 ¶35]. Ms. Jacobs was exempted from the rule because she did not have access to ACAPS. [Doc. 43-2 ¶35]; see also [Doc. 47-2 ¶35].  Like Plaintiff, Ms. Jacobs is an African-American woman.  [Doc. 43-2 ¶36]; [Doc. 47-2 ¶36]; see also [Doc. 49 ¶90].  Two other African-American women in the CLSC deactivated their real estate licenses and remained employed by SunTrust.  See [Doc. 43-2 ¶37]; [Doc. 47-2 ¶37].  If Plaintiff had deactivated her real estate license, she would not have been terminated.  [Doc. 43-2 ¶39]; see also [Doc. 47-2 ¶39].  Ms. Reed does not know of any CLSC teammate

with access to ACAPS who was allowed to have an active real estate license.  [Doc. 43-2 ¶40]; see also [Doc. 47-2 ¶40].

After her termination, Plaintiff emailed a letter to various SunTrust employees, including Ms. Reed, Ms. Reed's supervisor, and the Chief Executive Officer.  [Doc. 47-4 ¶11].  In that letter, Plaintiff identifies seven individuals "employed by SunTrust despite[ ] holding an active real estate license."  [Doc. 6-2 at 1–2].  One of those individuals, Ms. Jacobs, worked in the CLSC.  [Doc. 6-2 at 2].  However, none of the six other individuals worked in the CLSC and none of those six individuals were supervised by Ms. Reed.  See [Doc. 49 ¶90]; see also [Doc. 43-2 ¶¶42, 43]; [Doc. 47-2 ¶¶42, 43].  As mentioned above, Ms. Jacobs is an African-American woman.  [Doc. 43-2 ¶36]; [Doc. 47-2 ¶36].  None of the other six individuals are African-American women.  [Doc. 49 ¶90].

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of asserting the basis for her motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Apcoa, Inc. v. Fid. Nat'l Bank, 906 F.2d 610, 611 (11th Cir. 1990).  The movant can discharge this burden by merely "'showing'—that is, pointing out to the district court—

that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. After the movant has carried her burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating specific facts showing a genuine disputed issue for trial. Id. at 324.

While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material when it is identified as such by the controlling substantive law. Id. at 248.

Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." Anderson, 477 U.S. at 249-50. To the extent one party's

11

version of events "is blatantly contradicted by the record," the "court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 379-81 (2007).

## LEGAL ANALYSIS

As an initial matter, Plaintiff brings a claim for age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et. seq.* ("ADEA"). [Doc. 6 ¶¶185–95]. Defendants' move for summary judgment on the age discrimination claim, and Plaintiff offers no opposition. [Doc. 43-1 at 22–25]; [Doc. 47-1]. As such, Defendants' Motion for Summary Judgment as to Plaintiff's ADEA claim is deemed unopposed. See N.D. Ga. Loc. R. 7.1(B). For the reasons adequately articulated by Defendants, they are entitled to judgment as a matter of law on Plaintiff's ADEA claim. See [Doc. 43-1 at 22–25].

Plaintiff also brings claims for alleged race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* ("Title VII) and 42 U.S.C. § 1981 and for alleged gender discrimination under Title VII. [Doc. 6 ¶¶137–84, 196–206]. For the most part, the claims involve identical legal analyses and are discussed together. See Standard v. A.B.E.L Servs., 161 F.3d 1318, 1330 (11th Cir. 1998). But to the extent Plaintiff asserts a Title VII race discrimination claim under a "mixed-

motive" theory,[4] that is discussed separately.  See Quigg v. Thomas Cty. Sch. Dist., 814 F.3d 1227, 1235 n.4 (11th Cir. 2016) ("Mixed-motive and single-motive discrimination are different theories of discrimination, as opposed to distinct causes of action.  Specifically, they serve as alternative causation standards for proving discrimination.").

Before delving into the minutiae of the parties' arguments, the Court emphasizes the dilemma at the core of Plaintiff's claims.  Plaintiff challenges Ms. Reed's decision to not allow the CLSC teammates to have an active real estate license.  As will be discussed below, when Ms. Reed made the decision, she did not know Plaintiff—or anyone else other than Ms. Diljohn—had an active real estate license.  [Doc. 43-2 ¶27]; see also [Doc. 47-2 ¶27].[5]  Thus, Plaintiff's entire case hinges on her argument that, even though Ms. Reed did not know the race/gender of the teammates who would be affected by the challenged rule, Ms. Reed's decision was motivated by racial animus

---

[4] Plaintiff also purports to bring a "mixed-motive" claim under § 1981.  [Doc. 6 at 33].  But the "mixed-motive amendments to Title VII do not apply to § 1981 claims."  Mabra v. United Food & Commercial Workers Local Union No. 1996, 176 F.3d 1357, 1358 (11th Cir. 1999).  As such, Plaintiff's supposed "mixed-motive" claim under § 1981 fails as a matter of law.

[5] Plaintiff correctly points out that Ms. Reed was told that "others" have or had a real estate license.  [Doc. 47-2 ¶27]; [Doc. 47-12 at 1].  But this does not suggest that race and/or gender played any role in Ms. Reed's decision because there is no specificity regarding who any of these "others" may be.  [Doc. 47-12 at 1].

and/or a desire to discriminate based on Plaintiff's gender.[6]  In support of her claims, Plaintiff offers two categories of evidence: (1) Plaintiff's comparator evidence and (2) a variety of "other" evidence allegedly demonstrating racial animus.  See [Doc. 47-1 at 1–25].  The Court addresses each in turn.

## I.   **Plaintiff's Alleged Comparators**

Plaintiff can survive summary judgment "by navigating the now-familiar three-part burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." Lewis, 918 F.3d at 1217.  Under that framework, the plaintiff first has the burden of establishing a *prima facie* case of discrimination/retaliation.  See McDonnell Douglas, 411 U.S. at 802; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  If the plaintiff meets her burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 254; Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*).  The plaintiff is then given an opportunity to show that the defendant's proffered nondiscriminatory reason was merely a pretext for

---

[6]  Although Plaintiff brings a claim for gender discrimination, her response to the Motion for Summary Judgment never mentions any alleged animus based on gender/sex.  See [Doc. 47-1].  Nevertheless, the below analysis addresses both Plaintiff's race and gender discrimination claims.

discriminatory intent.  <u>Burdine</u>, 450 U.S. at 253; <u>Chapman</u>, 229 F.3d at 1024.

The most common way for a plaintiff to meet her burden of proving a *prima facie* case of discrimination is to show "she was treated less favorably than 'similarly situated' individuals outside her class." <u>Lewis</u>, 918 F.3d at 1224.  To be "similarly situated," an individual outside the plaintiff's protected class must be similar in "all material respects," which must be determined "on a case-by-case basis." <u>Id</u>. at 1227. Ordinarily, however, a similarly situated comparator must have: "engaged in the same basic conduct . . . as the plaintiff"; "been subject to the same employment policy, guideline, or rule as the plaintiff"; and "been under the jurisdiction of the same supervisor as the plaintiff." <u>Id</u>. at 1227–28.

Here, Plaintiff points to six supposed comparators: (1) Dwayne Collins, (2) Rich Tumicki, (3) Brandy Hellemn, (4) Brian Powell, (5) Wayne DeSilva, and (6) Nataliya Chey.  [Doc. 47-1 at 3].  Defendants argue that, because some of the individuals in this group are African-Americans and some are female, the "diverse nature [of the group] demonstrates that any difference in treatment between these individuals and Plaintiff is not a result of any intentional discrimination."  [Doc. 43-1 at 20].  But because none of the individuals identified by Plaintiff in her brief are African-American women, [7]

---

[7] As noted above, Plaintiff's initial letter describing her alleged comparators pointed to Sophia Jacobs as well.  [Doc. 6-2 at 2].  But Plaintiff never mentions Ms. Jacobs anywhere in the response to Defendants' Motion for Summary Judgment.  [Doc.

the Court concludes that the alleged comparators are outside Plaintiff's protected class. See Jefferies v. Harris County Community Action Ass'n, 615 F.2d 1025, 1034 (5th Cir.1980) (holding that "the fact that black males and white females [were] not subject to discrimination is irrelevant" because the plaintiff alleging discrimination was an African-American woman).

Plaintiff, for her part, asserts that "only three factors . . . are relevant to decide if the Comparators are similarly-situated in all material respects," namely whether the alleged comparators have real estate licenses, can access confidential information, and could potentially violate the Real Estate and Settlement Procedures Act ("RESPA"). [Doc. 47-1 at 4].  But the similarly-situated analysis is not nearly as narrow as Plaintiff claims; comparators must be similarly situated in "*all* material respects," and a wide variety of factors can be relevant.  See Lewis, 918 F.3d at 1227-28 (emphasis added). Because none of Plaintiff's alleged comparators were supervised by Ms. Reed, they are

---

47-1].  That is presumably because Ms. Jacobs, like Plaintiff, is an African-American woman, thus indicating Plaintiff *was not* discriminated against on the basis of her race/gender.  See [Doc. 43-2 ¶36]; [Doc. 47-2 ¶36].  Likewise, Plaintiff never mentions three other people pointed to by Defendants—Lillian Marks, Valerie Hill, and Janet Simms-Nieves—again presumably because those people are also African-American women.  See [Doc. 47-1]; see also [Doc. 43-2 ¶¶47–48]; [Doc. 47-2 ¶¶47–48].  Even looking only at Plaintiff's cherry-picked "comparators," Plaintiff's claims still fail for the reasons given below.

not similarly situated to Plaintiff in at least one crucial, material respect.[8]

Plaintiff argues the "Comparators not having the same supervisor is irrelevant" because SunTrust's Code of Business Conduct and Ethics (the "Code") states employees "must speak up when they become aware of significant risks to SunTrust." [Doc. 47-1 at 5].  But the evidence Plaintiff cites does not support her position that "having the same supervisor is irrelevant."  Quite the opposite.  The Code makes clear that reporting is left up to the discretion of the individual employee.  See [Doc. 47-9 at 2] ("If you identify an issue or have a concern, escalate upon identification . . . ."); see also [id. at 5] ("If you see something that does not look or feel right, promptly report concerns . . .").[9]  Specifically, looking at the section dealing with conflicts of interest— a section Plaintiff ignores in her brief—the Code states employees are to report "any situation **you think** creates, or could appear to create, a conflict of interest."  [Id. at 7] (emphasis added).

---

[8] Because the alleged comparators are not similarly situated in "all material respects," the Court need not address the parties' arguments regarding what information the alleged comparators could access and whether the alleged comparators could violate the Real Estate Settlement Procedures Act.  See Lewis, 918 F.3d at 1227–28.

[9] Plaintiff also cites to sections of the Code dealing with reporting harassment and unsafe conduct, as well as for responding to "requests from internal audit and government regulators."  [Doc. 47-9 at 6–7].  None of those provisions are relevant here.  Even if they were, they bolster the conclusion that employees need to "speak up" only if "[they] have concerns."  See [id.].

The Code is "not intended to address every issue or situation that may arise," and employees are to use their "common sense, sound judgment and individual integrity to determine proper conduct." [Id. at 5]. But a training course regarding the Code does provide some guidance regarding specific examples, and Plaintiff cites to one such "scenario." See [Doc. 47-1 at 5]. That scenario deals with a situation where an employee notices another employee "approv[ing] and process[ing] a number of vouchers for very large dollar amounts." [Doc. 47-17 at 19]; see also [id. at 49–50]. While the training course states employees "are obliged to escalate this issue to the appropriate manager," the scenario discussed is obviously not at issue in this case. [Id. at 49–50]. Indeed, the example does not deal with a conflict of interest at all, and instead deals with "a gap in a control or possible risk to the company because proper checks and balances or other processes are not in place." [Id. at 50].

Although never discussed by Plaintiff, the training course *does* contain guidance regarding what should occur if an employee "decides to engage in outside real estate activities." [Id. at 71]. The document states that the employee must "avoid actual or potential conflicts of interest" by discussing the issue "with his manager and obtain[ing] written approval." [Id.]. Thus, the Code makes clear that an employee potentially engaging in "outside real estate activities" could be an "actual or potential conflict[ ] of interest," and that issue should be brought to the attention of that

18

employee's particular manager.  [Id.].  SunTrust's outside employment policy, in turn, repeatedly emphasizes that individual managers "are empowered to use [their] judgement" in deciding whether outside employment would be a conflict of interest.  [Doc. 47-10 at 3, 7].  Because SunTrust managers are called upon to exercise their discretion in deciding if an action is a conflict of interest, an employee's supervisor is material to the comparator analysis.

Plaintiff cites to several out-of-Circuit cases to support her argument that she need not show her comparators were supervised by the same manager.  [Doc. 47-1 at 4, 9].  But those cases actually bolster the conclusion that Plaintiff's alleged comparators are fatally flawed.  In McMillan v. Castro, 405 F.3d 405 (6th Cir. 2005), the Sixth Circuit acknowledged that the plaintiff was "undoubtedly correct that whether or not she and [her alleged comparator] dealt with the same *immediate* supervisor, which they clearly did not, is wholly irrelevant to her claim."  Id. at 414 (emphasis in original).  But, the McMillan Court explained, "in order to be considered similarly situated, [the plaintiff and her alleged comparator] must have dealt with the same ultimate decision-maker, rather than the same supervisor."  Id.  Likewise, the court in Blackshear v. City of Wilmington, 15 F. Supp. 2d 417 (D. Del. 1998) rejected the defendant's argument that the plaintiff's comparator was not similarly situated "because different supervisors were involved."  Id. at 424.  But Blackshear is readily

distinguishable because the plaintiff and the comparator *did* have the same "direct supervisor" at the time the adverse employment actions occurred.  Id. at 423.  In any event, even though the "bulk" of the comparator's misconduct occurred when he had a different immediate supervisor, that distinction had "little meaning" because the ultimate decision-maker called upon to impose "disciplinary action" was the same.  Id. at 424–25.

Plaintiff's own cases demonstrate that, while comparators need not have the same "immediate" or "direct" supervisor *per se*, to be similarly situated a plaintiff must show that her comparators were subject to the authority of the same ultimate decision maker.  McMillan, 405 F.3d at 414; Blackshear, 15 F. Supp. 2d at 423-25.  Thus, to show *Ms. Reed's* decision was motivated by racial animus, Plaintiff must show *Ms. Reed* treated similar subordinates differently.  The fact that other managers exercised *their* discretion differently does not show *Ms. Reed* acted with racial animus.  See Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989) (holding that "it is the motives of [the decision-maker]—not those of [a different supervisor]—which are at issue").  Because the individual managers were vested with discretion in assessing whether a subordinate's actions are a conflict of interest, Plaintiff must show her comparators were supervised by the same decision-maker in order to show they were similarly situated in all material respects.  See Lewis, 918 F.3d at 1227-28.

20

None of Plaintiff's alleged comparators worked in the CLSC or reported to Ms. Reed.  [Doc. 43-2 ¶¶42–43]; <u>see also</u> [Doc. 47-2 ¶¶42–43].  As such, they are not similarly situated in all material respects, and Plaintiff fails to prove a prima facie case of discrimination by pointing to proper comparators.  But a "plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case."  <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321, 1328 (11th Cir. 2011).  So long as she "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent," she can prove her prima facie case.  <u>Id</u>.  Therefore, the Court turns to the other evidence Plaintiff presents to support her argument that "racial animus motivated SunTrust's decision."  <u>See</u> [Doc. 47-1 at 13–25].

## II.  <u>Plaintiff's Other Evidence of Purported Racial Animus</u>

Plaintiff points to four kinds of other evidence that allegedly demonstrates racial animus: (a) "the lack of documentation in this case," (b) Ms. Reed's alleged failure to follow SunTrust's policy regarding outside employment, (c) that "Ms. Reed did not have an honest or mistaken belief" that Plaintiff could receive a referral fee, and (d) that Ms. Reed's testimony about "receiving a referral fee is a post hoc justification." [Doc. 47-1 at 14–25].  The Court addresses each of these arguments in turn.

First, Plaintiff points to a supposed "lack of documentation in this case."  [<u>Id</u>. at 14–20].  Plaintiff's argument, however, focuses exclusively on a lack of documentation

21

with respect to *Ms. Diljohn's employment request*, and whether *Ms. Diljohn's* immediate supervisor "wanted to deny the employment request because Ms. Diljohn is a African-American woman." [Id. at 14–19]. Needless to say, Ms. Diljohn is not a party to this case, and her supervisor had no involvement in the decision to terminate Plaintiff. Evidence regarding Ms. Diljohn's requests is only relevant to the extent it shows *Ms. Reed* harbored a discriminatory animus.

Looking to Ms. Reed's actions, Plaintiff argues Ms. Reed "did not document [her] motives" because she "could not think of a pretext to coverup [her] racial animus towards Ms. Diljohn." [Doc. 47-1 at 18]. But contrary to Plaintiff's argument, there is ample documentation regarding Ms. Reed's motives for denying Ms. Diljohn's request, and that documentation does not suggest any racial animus. [Docs. 47-12, 47-13]. The fact that the emails and conversations were not recorded in Workday is not, as Plaintiff argues, evidence of some nefarious motive. The discussions were not recorded in Workday because they occurred *before* SunTrust used Workday to facilitate the process for employees to seek permission for outside employment. See [Doc. 43-6, ¶4]; [Doc. 47-10 at 1] (providing that teammates "only need to submit *new* requests through Workday" and that "approvals granted before 1/1/19 do not need to be recorded in Workday") (emphasis in original); see also [Docs. 47-12, 47-13]. Thus,

even to the extent the "lack of documentation" has any relevance to Plaintiff's claims, it fails to provide any actual support for the claims.

Plaintiff next contends that Ms. Reed's emails are "evidence of racial discrimination" because they "only allege Ms. Diljohn's employment request create[d] a *potential conflict* of interest." [Doc. 47-1 at 20] (emphasis in original). According to Plaintiff, SunTrust's policy provided that a mere potential conflict should not bar outside employment. [Id. at 20–21] (citing [Doc. 47-10 at 7]).[10] But the policy also states, "The appearance of a conflict may be just as important as an actual conflict and must also be avoided." [Doc. 47-10 at 7]. As discussed above, the policy also states that managers "are empowered to use [their] judgement" in deciding whether to grant or deny an outside employment request. [Id.]; see also [id. at 3].

Plaintiff's argument on this point boils down to whether having an active real estate license created the "potential for a conflict of interest," which would not be the basis for denying outside employment, or whether it created an "appearance of a conflict," which was to be "avoided" under SunTrust's policy. See [id.]. Indeed, Plaintiff spends the next several pages of her brief arguing over whether Ms. Reed

---

[10] Although this is apparently page "8" of the policy, it is the seventh page of [Doc. 47-10] because page "7" is missing. See [Doc. 47-10 at 6–7]. The undersigned's citations are to the EM/ECF page numbers printed at the top of each page.

honestly believed "a real estate broker could help a person get a second mortgage for a home" and "could receive a referral fee from a mortgage lender or broker." [Doc. 47-1 at 21–24].

Unfortunately for Plaintiff, the Court is not "a super-personnel department that reexamines an entity's business decisions." Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988)).  Ms. Reed might have been right in believing that having an active real estate license "is a conflict of interest," or she might have been wrong.  See [Doc. 47-15].  Either way, Plaintiff cannot succeed by showing "merely that the defendant's employment decisions were mistaken."  Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000).  The Court's "inquiry is limited to whether the employer gave an honest explanation of its behavior," no matter how mistaken a manager was in her beliefs.  Elrod, 939 F.2d at 1470 (quoting Mechnig, 864 F.2d at 1365).

Plaintiff argues Ms. Reed must have had full and complete knowledge of the rules and regulations regarding real estate agents, real estate brokers, and mortgage brokers because Ms. Reed took "courses related to mortgage fraud," the Home Mortgage Disclosure Act, and the Real Estate Settlement Procedures Act ("RESPA").  [Doc. 47-1 at 21–24].  Yet, Plaintiff provides no evidence regarding what

was actually taught during those courses, and Plaintiff's "pure conjecture" regarding what Ms. Reed might have learned is not sufficient to create a genuine issue of material fact. Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). In any event, Ms. Reed's emails do not mention mortgage fraud, the Home Mortgage Disclosure Act, or RESPA, rendering Plaintiff's arguments regarding the courses irrelevant. See [Docs. 47-12, 47-13, 47-14, 47-15]. Plaintiff points out that Ms. Reed does not "understand how a real estate broker business makes money" and does not have a firm understanding of how "real estate agents are paid," but this only serves to undermine Plaintiff's claims. [Doc. 47-1 at 24].

Ms. Reed's lack of understanding may show her beliefs were *mistaken*, but it does not show that she was *dishonest* in stating she believed "it is a conflict of interest . . . for CLSC teammates to have active [real estate] licenses if they have access to ACAPS application data." See [Doc. 47-15]. Regardless of whether Ms. Reed was right or wrong in thinking that a conflict of interest existed, there is no evidence that race and/or gender played any role in Ms. Reed's decision. Ms. Reed decided "to prohibit CLSC teammates from having an active real estate license" without any knowledge that Plaintiff had an active real estate license. [Doc. 43-2 ¶27]; [Doc. 47-2 ¶27]. As will be discussed more below, Ms. Reed enforced her rule—whether it was based on mistaken beliefs or no——without regard to the race and/or gender of the

subordinate that had an active real estate license.  [Doc. 43-2 ¶34]; <u>see also</u> [Doc. 47-2 ¶34].

The last argument in Plaintiff's brief is that Ms. Reed "falsely made up the idea" of Plaintiff receiving a referral fee from a broker as a post hoc justification for deciding that having an active real estate license was a conflict of interest.  [Doc. 47-1 at 25] (emphasis omitted).  Plaintiff's argument falls short.  Ms. Reed explicitly stated she was concerned that a teammate could use SunTrust Bank's information "for their own personal gain" by "giv[ing] the name of a client . . . to the real estate broker."  [Doc. 47-14].  The fact that Ms. Reed did not explicitly use the phrase "referral fee" to explain how a teammate could "personal[ly] gain" by "giv[ing] the name of a client . . . to the real estate broker" does not mean she has now offered a post hoc justification for her decision.  <u>See</u> [<u>id.</u>]; <u>see also</u> <u>Phillips v. Aaron Rents, Inc.</u>, 262 F. App'x 202, 210 (11th Cir. 2008) (explaining that an employer's reasons for terminating an employee "must be fundamentally inconsistent in order to constitute evidence of pretext").

Ms. Reed made the decision to terminate Plaintiff.  [Doc. 43-2 ¶31]; [Doc. 47-2 ¶31].    Thus, Plaintiff must show Ms. Reed's decision was motivated by a discriminatory animus.  <u>See</u> <u>Jones</u>, 874 F.2d at 1541.  The evidence, if anything, shows the exact opposite.  Plaintiff freely admits that Ms. Reed never once mentioned Plaintiff's race, gender, or age.  [Doc. 43-2 ¶56]; [Doc. 47-2 ¶56].  Instead, Ms. Reed

decided to prohibit *all* CLSC teammates with access to ACAPS from having active real estate licenses.  [Doc. 43-2 ¶21]; <u>see also</u> [Doc. 47-2 ¶21].  At the time she decided on this rule, Ms. Reed did not know Plaintiff had an active real estate license, and thus Ms. Reed's decision could not have been motivated by any animus against Plaintiff based on her race/gender.  [Doc. 43-2 ¶27]; [Doc. 47-2 ¶27].  Ms. Reed applied her rule uniformly to all CLSC teammates.  [Doc. 43-2 ¶34]; <u>see also</u> [Doc. 47-2 ¶34].  The only person in the CLSC who was allowed to have an active real estate license was Ms. Jacobs.  [Doc. 43-2 ¶35]; <u>see also</u> [Doc. 47-2 ¶35].  The fact that Ms. Jacobs was exempted supports SunTrust's argument that Ms. Reed was only concerned about CLSC teammates with access to ACAPS.  [Doc. 43-2 ¶35]; <u>see also</u> [Doc. 47-2 ¶35]. More importantly, it shows Ms. Reed did not harbor any discriminatory animus against African-American women, because Ms. Jacobs, like Plaintiff, is an African-American woman.  [Doc. 43-2 ¶36]; [Doc. 47-2 ¶36]; <u>see also</u> [Doc. 49 ¶90].

Unable to show any discriminatory animus on behalf of the decision-maker, Plaintiff points to a "lack of documentation" and quibbles over whether Ms. Reed correctly decided that having an active real estate license was a conflict of interest.  No reasonable jury could find that Plaintiff's race/gender "was a motivating factor for the . . . adverse employment action," and thus Plaintiff cannot succeed even under the lesser causation standard needed to prove a mixed-motive theory.  <u>Quigg</u>, 814 F.3d at 1239

(quoting <u>White v. Baxter Healthcare Corp.</u>, 533 F.3d 381, 400 (6th Cir. 2008)) (quotation marks and alterations omitted).[11]  For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted.

<u>**CONCLUSION**</u>

As explained above, the undersigned **RECOMMENDS** that the Motion for Summary Judgment ([Docs. 42, 43]) be **GRANTED**.  Since this is a final Report and Recommendation and there are no other matters pending before this Court, the Clerk is directed to terminate the reference to the undersigned.

**SO ORDERED AND REPORTED AND RECOMMENDED**, this   16   day of November, 2020.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

---

[11] Plaintiff only mentions her mixed-motive theory in a footnote.  <u>See</u> [Doc. 47-1 at 13–25].  As such, the Court could deem her mixed-motive argument waived.  See Mock v. Bell Helicopter Textron, Inc., 373 F. App'x 989, 992 (11th Cir. 2010) (deeming an argument raised "in passing in a footnote only" to be waived).  In any event, Plaintiff cannot even show that a protected characteristic "was a motivating factor," and thus the claim fails.  <u>See</u> Quigg, 814 F.3d at 1239.